UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

DARKLISS KEYES,

                      Plaintiff,

      v.

WASHINGTON COUNTY; EDWARD DALE
JOHNSON; and WASHINGTON COUNTY
LAND USE AND TRANSPORTATION,

                      Defendants.
_____

Case No. 3:15-cv-1987-AC

OPINION AND ORDER

ACOSTA, Magistrate Judge:

      Plaintiff Darkliss Keyes ("Keyes") filed this lawsuit against defendants Washington County ("the County"), Washington County Land Use and Transportation ("LUT") (collectively, "County Defendants"), and Edward Dale Johnson ("Johnson") (collectively, "Defendants"). Keyes alleges that Johnson, while an employee of LUT, harassed and sexually assaulted Keyes while she performed court-ordered community service. She asserts claims under state and federal law. County

Defendants filed a motion for summary judgment on all claims against them.  (ECF No. 34.)

Johnson filed a motion for partial summary judgment on the federal claims against him.  (ECF No. 37.)  The court grants in part and denies in part both motions.

*Procedural Background*

Keyes filed her initial complaint in 2015.  (ECF No. 1.)  The County Defendants filed motions to dismiss and for judgment on the pleadings.  (ECF No. 8.)  In 2016, the court granted in part and denied in part the County Defendants' motions and allowed Keyes leave to amend.  (ECF No. 26.)  The court found Keyes plausibly alleged a violation of the Eighth Amendment but otherwise failed to allege sufficient facts to support her claims.  (*Id.* at 4–12.)  Keyes filed a First Amended Complaint ("FAC") in accordance with the court's opinion.  (ECF No. 28.)

*Factual Background*

I.  Johnson.

Johnson began working for the County as a plumbing inspector in 1995.  (Decl. of Neil Weingart ("Weingart Decl.") (ECF No. 42), Ex. 3 at 1.)  Johnson became a Community Service Program Monitor in 2011.  (*Id.*)  The responsibilities of a Community Service Program Monitor include coordinating, supervising, and monitoring the work of persons performing community service as part of a criminal sentence.  (Decl. of Chris Gilmore Decl. ("Gilmore Decl.") (ECF No. 35), Ex. 11 at 1–2.)  As a Community Service Program Monitor, one of Johnson's duties was to "[t]ake action to address and correct unacceptable performance or conduct of crew members, including non-compliance with safety or behavioral standards [and r]emove crew members from performing their duties if non-compliance with safety and behavioral standards is not corrected." *Id.* at 2.  Community Service Program Monitors do not have the authority to revoke probation or to

arrest or detain anyone. (Gilmore Decl., Ex. 7 ("Keyes RFA") at 5.)

The County and LUT have had a "Harassment-Free Workplace Policy" since 1998. (Gilmore Decl., Ex. 1 at 4.) The Harassment-Free Workplace Policy applies to all County employees, and forbids the harassment of other County employees. (*Id.* at 1.) The County also had a "Violence in the Workplace Policy," which applies to "all persons involved in the County's operation." (Gilmore Decl., Ex. 2.) Under the Violence in the Workplace Policy, all "threats or acts of violence" between County employees and members of the public are prohibited. (*Id.* at 1.) Acts of violence include any conduct "that is sufficiently severe offensive, or intimidating to . . . create a hostile abusive, or intimidating work environment" for an employee or member of the public. (*Id.*) There were no policies or training programs specific to Johnson's role as a Community Service Program Monitor. (Gilmore Decl., Ex. 23 at 4:14–5:16.)

Johnson was familiar with the Harassment-Free Workplace Policy. (Gilmore Decl., Ex. 8 ("Johnson Dep.") 73:14–19.) He also attended a "Harassment in the Workplace" training in 2006. (Gilmore Decl., Ex. 3.) Johnson received a copy of and was counseled on the Violence in the Workplace Policy in 2005. (Gilmore Decl. Ex. 5 at 2.) Johnson did not receive any training on the constitutional or other rights of persons on probation. (Johnson Dep. 61:4–13.)

Prior to the incidents giving rise to this lawsuit, Johnson received formal discipline five times — twice for sexually charged conduct. (*Id.*) In 1998, Johnson received a written warning for making inappropriate and demeaning sexual remarks to a coworker's wife during business hours and while using a county vehicle. (Weingart Decl., Ex. 5 at 1.) Johnson received oral counseling on the County's Violence in the Workplace policy for an unspecified reason. (Weingart Decl., Ex.6.) In 2003, Johnson received a formal letter of discipline and a two-day unpaid suspension, in part for

making inappropriate sexual remarks on the job.  (Weingart Decl., Ex. 7 at 1–2.)  Johnson was also directed to attend counseling and to review the County's Harassment and Violence in the Workplace policies.  (*Id.* at 2.)

Johnson also gave at least one unsolicited back massage to a female supervisor.  (Weingart Decl., Ex. 8 ("Okazaki Dep."), 12:20–13:3; Weingart Decl., Ex. 10.)  Johnson's massage or massages made the supervisor uncomfortable.  (Okazaki Dep., 13:4–6.)  There is no record of the supervisor reporting the unsolicited massages or referring Johnson for additional training after the massaging incident, however.

II.  Keyes.

Keyes was convicted of driving under the influence of intoxicants in 2013.  (Keyes RFA at 7.)  Keyes was sentenced to enhanced bench probation, and required to perform court-ordered community service.  (*Id.* at 7–8; Weingart Decl., Ex. 16 ("Keyes Aff.") ¶ 1.)  Keyes had multiple available venues for fulfilling her community service sentence. (Weingart Decl., Ex. 14 ("Keyes Dep."), 24:8–14.)[1]  Some of the community-service options were with private, non-profit organizations.  (Keyes RFA at 8–9.)

III.  Groping incident.

On the morning of April 4, 2014, Keyes arrived at the parking lot of the Washington County Jail, the LUT pick-up site for community-service workers .  (Gilmore Decl., Ex. 6 ("Police Rep.") at 4.)  The LUT community-service work crew program ran on a daily basis.  (Weingart Decl., Ex. 1.)  Various rules governed the clothing, personal property (including mobile phones), and conduct

---

[1] Other excerpts of the Keyes deposition are elsewhere in the record.  (*See* Weingart Decl., Ex. 14; Gilmore Decl. Ex. 10.)

of persons performing court-ordered community service at LUT. (*Id.*) The Community Service Program Monitors picked up crews from those assembled in the parking lot each morning, to complete daily projects. (*Id.*; Police Rep. at 4.) The workday for community-service workers lasted approximately from 8 a.m.–3 p.m. (Weingart Decl., Ex. 1.) On April 4, Keyes stood in line next to Ulan Moore ("Moore"). Keyes and Moore had worked together previously on a LUT work crew. (Keyes Dep. 35:16–23.)

Johnson's project on April 4 was to dispose of deer carcasses. (Johnson Dep. 29:21–24; Keyes Dep. 36:17.) He wore work clothes and a neon safety vest. (Police Rep. at 6.) Johnson selected Moore for the project because Moore had done similar work the previous day. (Johnson Dep. 30:12–16.) Initially, Johnson did not want to select Keyes because he thought women could not dispose of deer carcasses. (*Id.*; Keyes Dep. 36:11–22; Police Rep. at 4.) After Moore told Johnson that Keyes was comfortable with dead deer, Johnson changed his mind and selected Keyes. (Keyes Dep. 36:11–22; Johnson Dep. 30:12–16; Police Rep. at 4.) Keyes and Moore were the only workers on Johnson's crew. (Keyes Dep. 36:21–23; Keyes Aff. ¶ 3.) Johnson had documents detailing Keyes's and Moore's criminal convictions. (Police Rep. at 6.)

Johnson drove Keyes and Moore to and from their work sites in a county-owned van. (Keyes Aff ¶ 4; Police Rep. at 4.) During their lunch break, Keyes showed Moore pictures on her mobile phone. (Police Rep. at 5.) Johnson asked Keyes to show him what she and Moore had been looking at on her phone. (*Id.*) Based on Johnson's statements throughout the day, Keyes believed Johnson had the authority to arrest her or cause her to be arrested for any misconduct during her community service. (Keyes Aff. ¶ 7.) Keyes thought Johnson was enforcing a rule of the community service program, and gave her phone to Johnson. (Police Rep. at 5.) Johnson saw a photo on Keyes' phone

of Keyes in a bathing suit.  (*Id.*)  Johnson then asked Keyes if she had any "sexy pictures" on her

phone.  (*Id.*)  Keyes replied that she did not, and told Johnson she had a boyfriend and two children.

(*Id.*)  Johnson began talking about some graphic and sexually explicit photos which he had seen on

a female coworkers's mobile phone.  (*Id.*)  After lunch, Johnson told Keyes she was to take "sexy

pictures" of herself and bring them to community service the next day as a "homework" assignment.

(*Id.*; Keyes Aff. ¶ 8.)

At the end of the workday, Johnson drove the van to a gas station across the street from the

usual drop-off location, the Washington County Jail parking lot.  (Police Rep. at 5; Keyes Aff. ¶ 9.)

Keyes got out of the van.  (Keyes Aff. ¶ 9.) She then reached back into the van to retrieve her duffel

bag.  (*Id.*; Police Rep. at 5.) As Keyes reached into the van, Johnson grabbed her buttocks and genital

area.  (Police Rep. at 5–6; Keyes Aff. ¶ 9.)  Keyes froze momentarily before she realized what

Johnson was doing.  (Keyes Dep. 70:18–24.)  Upon realizing Johnson was groping her, Keyes moved

away from Johnson as fast as she could.  (*Id.* 70:18–71:2.)  Johnson did not attempt to keep Keyes

from leaving.  (*Id.*)  Johnson told Keyes that she was "a bad girl"" and that he would "teach [her]

how to get a spanking."  (Keyes Aff. ¶ 10; Police Rep. at 6.)  When Keyes looked back at Johnson,

he made a hand gesture simulating taking photos with a camera, which Keyes understood as a

reference to the "homework" Johnson had assigned earlier in the day.  (Keyes Aff. ¶ 10; Keyes Dep.

71:8–21.)

*Legal Standard*

Federal Rule of Civil Procedure ("Rule") 56(c) authorizes summary judgment if no genuine

issue exists regarding any material fact and the "moving party is entitled to judgment as a matter of

law." The moving party must show an absence of a genuine issue of material fact.  *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 323 (1986). A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). The court's role is not to "weigh the evidence or determine the truth of the matter, but only determine[] whether there is a genuine issue for trial." *Balint v. Carson City*, 180 F.3d 1047 (9th Cir. 1999). The court must view the inferences drawn from the facts in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982).

*Analysis*

Keyes seeks damages for constitutional violations, under 42 U.S.C. § 1983, and for common-law torts, under Oregon law. As the basis for her § 1983 claims against all defendants, Keyes asserts violations of the Fourth and Eighth Amendments to the United States Constitution. Keyes also asserts claims for battery against all defendants and negligence against County Defendants. County Defendants seek summary judgment on all of Keyes' claims against them. Johnson seeks summary judgment as to the constitutional claims against him.

I. Fourth Amendment Claims.

Keyes alleged Johnson violated the Fourth Amendment when he grabbed her genital area. Specifically, Keyes argues Johnson's conduct was a seizure within the meaning of the Fourth Amendment, unsupported by probable cause or reasonable suspicion. Keyes also asserts a failure-to-train claim under *Monell*,[2] contending County Defendants' training policies were deliberately indifferent to Keyes' Fourth Amendment right to be free from unreasonable seizures. County Defendants and Johnson each argue no Fourth Amendment violation occurred. In the alternative,

---

[2] *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978).

County Defendants submit that their anti-harassment policies and the lack of previous similar incidents defeat the lack of training and deliberate indifference components of Keyes' *Monell* claim.

   *A.  Fourth Amendment Violation.*

   County Defendants first argue the Fourth Amendment does not apply to Johnson's conduct at all because Johnson had no investigative or administrative purpose in grabbing Keyes, citing *United States v. Attson*, 900 F.2d 1427 (9th Cir. 1990).  The court disagrees.  The Fourth Amendment applies to any seizure, regardless of the reason for the seizure.  *Soldal v. Cook County*, 506 U.S 56, 69 (1992) ("[T]he reason why an officer might enter a house or effectuate a seizure is wholly irrelevant to the threshold question whether the Amendment applies.").  *Soldal* implicitly overruled *Attson* because *Attson*'s holding turned on the governmental actor's subjective motivation for conducting a search.  *Id.* at 1429; *see also Jane Doe I v. Valencia Coll. Bd. of Trustees*, 838 F.3d 1207, 1212–13 (11th Cir. 2016) (concluding *Attson* is not good law in light of *Soldal*).  Accordingly, the court concludes the Fourth Amendment applies to Johnson's conduct regardless of his subjective reason for grabbing Keyes.

   Defendants next argue that no seizure occurred, eliminating a necessary element of Keyes' unreasonable-seizure claim.  To analyze the merits of Keyes' Fourth Amendment claim, it is necessary to delineate its specific basis.  Keyes alleges a seizure occurred when Johnson groped her.  Her testimony establishes that the groping lasted "a few seconds," and that she moved away from Johnson as soon as she realized he was groping her.  (Keyes Dep. 70:5–24.)  Keyes' Fourth Amendment claim, then, is that a seizure occurred "for the instant of the touching."  (Resp. at 10.)  Johnson's conduct did not amount to a seizure under the Fourth Amendment.  As explained in more detail below, a seizure through physical contact requires an objective manifestation of intent to take

a person into custody or limit a person's freedom of movement beyond the moment of contact. Johnson's conduct, construed in the light most favorable to Keyes, objectively does not show such an intent.

A seizure occurs when a government official subjects a person to custodial arrest or "restrains [a person's] freedom to walk away" from the encounter. *Terry v. Ohio*, 392 U.S. 1, 12 (1968). Whether such a restraint has occurred depends on whether "in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Physical contact is often, but not always, sufficient to communicate that a person is not free to leave. *Compare United States v. Sokolow*, 831 F.2d 1413, 1415–16 (9th Cir. 1987) (grabbing a person's arm and forcing them to sit down was a seizure), *rev'd on other grounds*, 409 U.S. 1 (1989), *with Martinez v. Nygaard*, 831 F.2d 822, 826–27 (9th Cir. 1987) (grabbing a person's shoulder and releasing once gaining the person's attention was not a seizure).

For a Fourth Amendment seizure to occur through physical contact, there must be restriction on freedom of movement beyond the instant of physical contact. For example, in *Martinez*, an agent grabbed the plaintiff's shoulder as the plaintiff walked past the agent during an immigration-enforcement raid, releasing the plaintiff's shoulder after the plaintiff turned to face the agent. *Martinez*, 831 F.2d at 826–27. No seizure occurred because the physical contact's objective purpose was to get the plaintiff's attention, even though the agent's physical contact with the plaintiff momentarily restricted the plaintiff's freedom of movement. *Id.* (citing *I.N.S. v. Delgado*, 466 U.S. 210, 220 (1984)). In contrast, the *Sokolow* court found that a seizure occurred when an agent approached a suspect waiting for a taxi at an airport, grabbed his arm, pulled him away from the

street, and forced him to sit down.  831 F.2d at 1416.  There, the physical contact's objective purpose was restrain the suspect's movement.  *Id.*

Johnson's groping had an objective purpose of initiating unwanted sexual contact.  Keyes testifies that Johnson did not attempt to stop her when she moved away, and "seemed kind of shocked that [she] didn't interact at that point."  (Keyes Dep. 71:3–6.)  He also made sexually suggestive remarks as he groped her.  (Police Rep. at 5.)  As in *Martinez*, Johnson's physical contact did not show an objective purpose to restrain Keyes' freedom of movement beyond the instant of contact.  *See Martinez*, 831 F.2d at 826–27.  To the extent *Martinez* is distinguishable from this case, such distinction arises from the benign purpose of the agent in *Martinez* (getting someone's attention) and the offensive intent present here (sexual assault or gratification).  *See id.*  A decision from the Seventh Circuit, however, concluded that an unjustified physical attack by a government employee, analogous to the facts presented here, did not amount to a Fourth Amendment seizure.

In  *McCoy v. Harrison*, an animal-welfare inspector entered onto the plaintiff's property to investigate a complaint regarding dog kennels on the property.  *McCoy v. Harrison*, 341 F.3d 600, 602–03 (7th Cir. 2003).  The inspector struck the plaintiff in the face after a verbal altercation, knocking her to the ground.  *Id.* at 603.  The inspector stood over the plaintiff and tightly grabbed her arm.  *Id.*  Then, the inspector released her arm and walked away.  *Id.*  The *McCoy* court held that being knocked to the ground and grabbed by a government official was not a seizure because the conduct did not show an intent to take control of the plaintiff or restrain her freedom of movement.  *Id.* at 605–06 (first citing *Brower v. County of Inyo*, 489 U.S. 593 (1989), then citing *California v. Hodari D.*, 499 U.S. 621 (1991)).  The *McCoy* court specifically rejected an argument that the grabbing alone constituted a seizure.  *Id.* at 606.

The analysis of *McCoy* is consistent with *Martinez* and *Sokolow*, and thus persuasive. A seizure requires more than the restriction on the freedom of movement inherent in physical contact. *Martinez*, 831 F.2d at 826–27; *McCoy*, 341 F.3d at 606. Keyes cannot sustain a claim for a Fourth Amendment seizure based on " the instant of the touching" alone. Although the conduct established in the record is offensive and inappropriate, there is no Fourth Amendment violation without a seizure. *See McCoy*, 341 F.3d at 606 ("The Fourth Amendment prohibits unreasonable seizures not unreasonable, unjustified, or outrageous conduct in general." (emphasis omitted) (quoting *Carter v. Buscher*, 973 F.2d 1328, 1332 (7th Cir. 1992)). Accordingly, the court grants Johnson's motion for summary judgment on Keyes' Fourth Amendment claim against him.

B. Monell *Claim*.

A constitutional violation is a necessary element of a claim for municipal liability under *Monell*. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). Without the underlying constitutional violation, there can be no municipal liability. *Id.* The court therefore grants County Defendants' motion for summary judgment on Keyes' Fourth Amendment claim against them.

## II. Eighth Amendment.

Keyes also asserts a claim under the Eighth Amendment based on the sexual harassment and assault Johnson inflicted on her. County Defendants and Johnson argue there was no Eighth Amendment violation because Johnson had no authority over Keyes that would implicate the Eighth Amendment. As an initial matter, the court previously held that the Eighth Amendment protects people performing community service as a criminal sanction. (Op. & Order (ECF No. 26) at 6–8.) Defendants argue that even if the Eighth Amendment applies generally to community service, the record before the court does not establish Johnson had sufficient authority over Keyes to implicate

the Eighth Amendment. Defendants argue Johnson's position with LUT did not involve enforcing Keyes' court-ordered punishment or enforcing her conditions of probation. Defendants further argue that Johnson had no more authority over Keyes than her supervisors at the private organizations where Keyes completed other portions of her court-ordered community service.

Defendants' renewed arguments against applying the Eighth Amendment are unavailing. The Eighth Amendment "limits the kinds of punishment that can be imposed on those convicted of crimes." *Ingraham v. Wright*, 430 U.S. 651, 667 (1977). There is no dispute that Keyes was performing community service as a consequence of being convicted of a crime. As the court previously ruled, the Eighth Amendment applied to the conditions of Keyes' community service. During Keyes' time on the LUT crew, Johnson was supervising a portion of Keyes' court-imposed punishment. His position explicitly and implicitly allowed for him to control the conditions of Keyes' sentence during her shift. The LUT crews which Johnson supervised were a means for LUT to use available "community service labor to assist in public projects." (ECF No. 42, Ex. 18, at 1.) As a government employee with control over the conditions of the conditions of a person's punishment for a crime, the Eighth Amendment governed Johnson's conduct.

Moreover, there is no dispute that unwanted physical contact of a sexual nature is necessarily an excessive use of force under the Eighth Amendment. *Woods*, 692 F.3d at 1049–51 (holding that unwanted sexual touching necessarily meets the objective and subjective requirements for an Eighth Amendment excessive-force claim). Upon the record before the court, a reasonable jury could find that Johnson violated the Eighth Amendment by groping Keyes. Accordingly, the court denies Defendants' motion.

/ / / / /

*B.* Monell *Claim.*

County Defendants seek summary judgment on Keyes' *Monell* claim. First, County Defendants argue the existence of an anti-harassment policy precludes a finding of deliberate indifference towards the Eight Amendment rights of persons performing community service. Second, County Defendants argue a failure to train claim necessarily fails because there was no pattern of similar incidents. Keyes argues the County anti-harassment policy was not specific to Johnson's position, and that Johnson's history of harassment and unwanted physical contact was sufficient to support a failure to train claim.

The evidence Keyes submits does not support a *Monell* claim. The first element a *Monell* plaintiff must show is deliberate indifference, which "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citation omitted). Keyes does not meet this standard because County Defendants lacked actual or constructive notice that their policies would cause a constitutional violation. First, there is no pattern of prior constitutional violations. Second, where the constitutional violation constitutes criminal conduct, additional training is likely unnecessary. *See Flores v. County of Los Angeles*, 758 F.3d 1154, 1160 (9th Cir. 2014) ("If the threat of prison time does not sufficiently deter sexual assault, it is not plausible to assume that a specific instruction not to commit sexual assault will provide such deterrence."). Johnson's conduct violated at least one Oregon criminal statute. He pleaded guilty to Harassment, a class A misdemeanor under ORS § 166.065, for groping Keyes. (ECF No. 42, Ex. 19 at 5.) Accordingly, a *Monell* claim based on the groping is not tenable.

Keyes also asserts an Eighth Amendment claim for Johnson's verbal harassment prior to the

groping. Here, Keyes' *Monell* claim is also insufficient. The record does not show a pattern of similar constitutional violations. While Keyes argues that Johnson's prior misconduct was sufficient to support a *Monell* claim, a *Monell* claim requires a pattern of past constitutional violations. *See Flores*, 758 F.3d at 1159. None of Johnson's prior misconduct can support a *Monell* claim because it was not directed against persons serving criminal sentences, and thus was not a violation of the Eighth Amendment. Nor does Keyes submit evidence of any similar constitutional violations by other community service monitors, let alone sufficient violations to create a pattern. *Cf. Flores*, 758 F.3d at 1159 (multiple prior constitutional violations by one employee were insufficient to create a pattern). Even without considering County Defendants' anti-harassment policy, the record lacks any facts showing that the County Defendants had "actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). The possibility of additional training programs or policies that could have prevented Johnson's actions falls short of the deliberate indifference required to support a *Monell* claim. *Harris*, 489 U.S. at 391–92 (rejecting a lesser standard of fault because "[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident."). Accordingly, the court grants County Defendants' motion for summary judgment on the Eighth Amendment *Monell* claim.

   *C. Qualified Immunity*.

   Johnson also seeks summary judgment under the doctrine of qualified immunity. Qualified immunity protects government employees from liability so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have

known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Johnson contends he is entitled to qualified immunity because the application of the Eighth Amendment to community service workers was not clearly established at the time of the incident. Keyes responds that Oregon's criminal code provided sufficient notice that Johnson's conduct was unlawful. Keyes' position, however, is foreclosed by *Davis v. Scherer*, 468 U.S. 183, 193–96 (1984). In *Davis*, the Court held that an official may have qualified immunity for a constitutional violation even if the official's action is illegal under state law. *Id.* at 194 ("Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision."). That Johnson's conduct was illegal under state law does not eliminate the availability of qualified immunity for the constitutional violation.

The dispositive issue is whether Keyes' right to be free from being sexually assaulted while she served her sentence of community service was clearly established at the time of the violation. *Pearson*, 555 U.S. at 231. The right of a prison inmate to be free from sexual assault by guards was clearly established at the time of Johnson's conduct. *See Woods*, 692 F.3d at 1049–51 (in 2012, holding that a guard's unwanted sexual touching of an inmate violated the Eighth Amendment). As noted in the court's previous opinion, courts differ in their application of the Eighth Amendment to persons serving community service. Nonetheless, Keyes had a clearly established right to be free from sexual assault by a public employee, even if the application of the Eighth Amendment was not clearly established. *See Fontana v. Haskin*, 262 F.3d 871, 882 n.6 (9th Cir. 2001) (citing multiple cases finding violations of the Fourteenth Amendment's substantive due-process clause when public employees committed sexual assault). Accordingly, Johnson is not entitled to qualified immunity.

/ / / / /

III.  _Respondeat Superior_ Liability.

County Defendants seek summary judgment on Keyes' battery claim against them.  Keyes asserts a theory of _respondeat superior_ liability against County Defendants, arguing Johnson was acting in the course of his employment when he groped Keyes.  County Defendants contend the record shows Johnson acted outside the course and scope of his employment.

Under Oregon law, "an employer is liable for an employee's torts, including intentional torts, if the employee was acting within the scope of employment."  _Fearing v. Bucher_, 328 Or. 367, 372 (1999).  The scope-of-employment inquiry is: "(1) whether the act occurred substantially within the time and space limits authorized by the employment; (2) whether the employee was motivated, at least partially, by a purpose to serve the employer; and (3) whether the act is of a kind which the employee was hired to perform."  _Chesterman v. Barmon_, 305 Or. 439, 442 (1988) (citations omitted).  Intentional torts are generally not within the scope of an employee's expressly authorized activities.  _Fearing_, 328 Or. at 373 n.4.  When considering a _respondeat superior_ claim based on an intentional tort, Oregon courts therefore analyze whether non-tortious conduct that "resulted in the acts that caused injury" satisfies the second and third _Chesterman_ requirements.  _Id._ at 374–75; _see also Lourim v. Swenson_, 328 Or. 380, 386–87 (1999) (using same approach).  A post-_Fearing_ decision framed the intentional-tort-specific analysis as: "the performance of the employee's duties must be a necessary precursor to the misconduct and . . . the misconduct must be a direct outgrowth of, and have been engendered by, conduct that was within the scope of the employee's employment."  _Barrington ex rel. Barrington v. Sandberg_, 164 Or. App. 292, 295 (1999) (summarizing _Fearing_ approach).

_Fearing_, _Lourim_, and _Barrington_ all addressed allegations of sexual assault.  In _Fearing_, a

priest sexually abused an adolescent. *Fearing*, 328 Or. at 372. The court found that the relationship

the priest built with the victim and his family which lead to the abuse was part of the duties the priest

was hired to perform. *Id.* The priest was able to sexually assault the victim because he had trust,

respect, and authority as a result of his employment duties. *Id.* at 377. The court then concluded that

whether the priest's initial motivation in building a relationship with the victim and his family was

to serve his employer, or whether the priest sought to abuse the victim from the beginning, was a jury

question. *Id.* at 372–73. Similarly, in *Lourim*, where a Boy Scout leader sexually abused a minor,

the court concluded that building a relationship with the victim and his family and exercising

supervisory authority over the victim were necessary precursors to the abuse. *Lourim*, 328 Or. at

386–87. There, the relationship encouraged by the employer and the supervisory authority the

employer invested in the leader were "ordinary and authorized duties of a Boy Scout leader." *Id.*

Whether the leader began with a motivation to serve the employer was an issue of fact for the jury.

*Id.* at 386. In contrast, where a respiratory therapist assaulted a hospital patient in the middle of the

night, *respondeat superior* liability did not apply. *R.L. v. Kaiser Foundation Hospitals*, 306 Or. 54,

60–61. The facts in *R.L.* did not satisfy the *Chesterman* requirements because there was no alleged

connection between the respiratory therapist's duties as an employee and the assault. *Id.*

      In sum, Oregon courts apply *respondeat superior* liability to an employee's intentional torts

if the employee's performance of their employment duties led to the intentionally tortious conduct.

The issue, then, is whether Johnson's performance of his assigned duties led to the groping incident.

The court concludes that genuine issues of material fact precludes summary judgment.

      There is no dispute that Johnson meets the first of the *Chesterman* requirements. The battery

occurred in or near the van Johnson drove for LUT during work hours. As to the second and third

*Chesterman* factors, Keyes submits evidence upon which a jury could find both requirements are fulfilled. A jury could find that the battery was a culmination of Johnson's previous request to see Keyes' smartphone, directions to complete demeaning "homework" assignments, and other inappropriate and harassing remarks. *See Lourim*, 328 Or. at 386 ("[A] jury could reasonably infer that the sexual assaults were merely a culmination of a progressive series of actions that involved the ordinary and authorized duties of a Boy Scout leader.") A jury could further conclude that Johnson's earlier remarks began as part of his assigned duties to supervise and direct Keyes in completing her community service, and that his initial motivation was to serve County Defendants by supervising and directing Keyes.[3] Accordingly, genuine issues of material fact preclude summary judgment on Keyes' *respondeat superior* claim against County Defendants.

## V.  Negligent Hiring and Retention.

Keyes alleges County Defendants were negligent in hiring and retaining Johnson despite his history of on-the-job sexual harassment. A negligent hiring or retention claim requires proof that the employer hired or retained an employee with dangerous propensities of which the employer knew or should have known. *Hansen v. Cohen*, 203 Or. 157, 160–61(1954); *Hoke v. May Dep't Stores Co.*, 133 Or. App. 410, 416 (1995). Keyes contends County Defendants knew or should have known about Johnson's propensity for sexual harassment and assault because of Johnson's past on-the-job sexual harassment and unwanted touching of others. Because the negligent hiring claim relies on

---

[3] Keyes' attempt to show that Johnson's actual motivation for the battery was to punish her in service of County Defendants is both inapposite under *Fearing* and insufficient. (ECF No. 42, Ex. 15 ¶ 6.) A psychologist's testimony that conduct is "consistent with the potential" for multiple non-sexual motivations, one of which is punishment, does not rise above the level of speculation. Speculation is insufficient to create a genuine issue of material fact. *Guidroz-Braul v. Mo. Pac. Ry. Co.*, 254 F.3d 825, 829 (2001).

County Defendants' decision to transfer Johnson to the Community Service Program Monitor position, the hiring and retention claims are coextensive. County Defendants seek summary judgment, arguing Johnson's prior conduct was insufficient to provide actual or constructive notice of Johnson's propensity for sexual misconduct.

County Defendants primarily rely on *Kelley v. Oregon Shipbuilding Corp.*, 183 Or. 1 (1948). In *Kelley*, a shipyard worker beat and severely injured his former supervisor. *Id.* at 3. The aggressor threatened the victim two months before the attack and had a reputation for being argumentative, verbally aggressive, and a "bully." *Id.* at 8. The *Kelley* court recognized a cause of action for negligent retention and held that the applicable standard of care was that of "ordinary cautious and prudent employers under similar circumstances." *Id.* at 7. One of the applicable circumstances was that the beating occurred while the employer produced ships for use in the Second World War. *Id.* The *Kelley* court specifically noted that "if [the employer] had given heed to all of the rough talk and threats indulged in by many of the employees, the work of building ships would have been greatly impaired." *Id.* In consideration of the circumstances, the *Kelley* court held that the lack of prior attacks, other threats, or evidence of a vicious or dangerous reputation was fatal to the negligent retention claim. *Id.* Given the change in employment practices over time and lack of a global war effort in this case, the court cannot conclude that the standard of care applicable in *Kelley* applies here. Instead, a more recent case illustrates that Johnson's past conduct presents a genuine issue of material fact precluding summary judgment.

In *Hoke*, a minor accused a store security guard of sexually assaulting her after detaining her for shoplifting. *Hoke*, 133 Or. App. at 412–13. The guard had previously been accused of sexually assaulting another minor shoplifting suspect. *Id.* at 417. After a police investigation concluded no

assault had occurred, the store did not conduct an independent investigation. *Id.* at 417–18. The *Hoke* court concluded that the reasonableness of the investigation and retention of the guard was a material issue of fact. *Id.*

The court concludes that material issues of fact remain regarding the reasonableness of County Defendants' investigation into Johnson's past misconduct and of hiring and retaining Johnson in a community-service monitor position given his past misconduct. Keyes identifies three past incidents where County Defendants disciplined Johnson for workplace misconduct, including two incidents involving sexually inappropriate language. (Weingart Decl. Exs. 5–7.) Based on these past incidents of misconduct, a jury could find that County Defendants were negligent in hiring and retaining Johnson in his position as community-service monitor, where he had unsupervised authority over men and women.

Keyes also submits evidence that Johnson gave a female supervisor unwanted backrubs that made her uncomfortable. (Okazaki Depo. 13:4–6.) There is no evidence in the record of the supervisor reporting these backrubs or referring Johnson for retraining on County Defendants' harassment policy. Because other incidents of prior misconduct are independently sufficient for Keyes' negligent-retention claim to survive summary judgment, the court makes no determination at this time of the evidentiary significance of the supervisor's massages, or of whether the supervisor's knowledge of the massages is imputed to County Defendants. Accordingly, the court denies County Defendants' motion for summary judgment on Keyes' negligent hiring and retention claim.

## VI. Negligent Training.

Keyes asserts a separate claim against County Defendants for negligent training of Johnson.

(FAC ¶¶ 65–72.)  County Defendants nominally moved against all claims Keyes asserted against it. (Mot. at 1.)  Although this claim arose at oral argument, County Defendants did not separately address the negligent-training claim in its memorandum.  (Mot. at 19–21.)  County Defendants and Keyes addressed Johnson's training only within the *Monell* context, without discussing the state-law standards for a negligent-training claim.  (Mot. at 12–19; Resp. at 12–13.)  Because County Defendants failed to support their nominal motion against Keyes' negligent-training claim, the court denies the motion for summary judgment as to Keyes' negligent-training claim.

## Conclusion

The court GRANTS IN PART and DENIES IN PART County Defendants' motion for summary judgment.  (ECF No. 34.)  The court GRANTS IN PART and DENIES IN PART Johnson's motion for partial summary judgment.  (ECF No. 37.)

IT IS SO ORDERED.

DATED this 10th day of August, 2017.


_____
s/ John V. Acosta
JOHN V. ACOSTA
United States Magistrate Judge