UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

DARKLISS KEYES,

    Plaintiff,

v.

EDWARD DALE JOHNSON,
WASHINGTON COUNTY LAND USE
AND TRANSPORTATION, and
WASHINGTON COUNTY,

    Defendants.

Civ. No. 3:15-cv-01987-AC

OPINION AND ORDER

ACOSTA, Magistrate Judge:

*Introduction*

Before the court is defendants Washington County (the "County") and Washington County Land Use and Transportation's ("LUT") (collectively, "County Defendants" or "Defendants") Motion to Reconsider Ruling on Defendants' Motion for Summary Judgment or, in the Alternative,

OPINION AND ORDER — 1      [AHS]

to Certify the Question to the Oregon Supreme Court, ECF No. 51 (the "Motion"). In its August 10, 2017 Opinion and Order, the court granted in part and denied in part Defendants' Motion for Summary Judgment, ECF No. 34. (Opinion and Order (ECF No. 49) ("Summary Judgment Opinion")). For the reasons set forth below, the court declines to reconsider its previous decision on the merits and will not certify the question to the Oregon Supreme Court.[1]

*Background*

Plaintiff Darkliss Keyes ("Keyes") alleges that Edward Dale Johnson ("Johnson"), an employee of LUT and another defendant to this case, harassed and sexually assaulted her while she performed court-ordered community service. She asserts claims under state and federal law. (First Amended Complaint, ECF No. 28.)

Johnson began working for the County as a plumbing inspector in 1995 and became a Community Service Program Monitor in 2011. (Decl. of Neil Weingart (ECF No. 42) ("Weingart Decl."), Ex. 3 at 1.) His duties as such included coordinating and supervising those performing community service as part of a criminal sentence and, when necessary, taking "action to address and correct unacceptable performance or conduct of crew members, including non-compliance with safety or behavioral standards [and r]emov[ing] crew members from performing their duties . . . ." (Declaration of Chris Gilmore (ECF No. 35) ("Gilmore Decl."), Ex. 11 at 1–2.)

Johnson was familiar with the County and LUT's Harassment-Free Workplace Policy, which prohibited "acts of violence" including any conduct "sufficiently severe offensive, or intimidating to . . . create a hostile abusive, or intimidating work environment" for an employee or member of the public. (Gilmore Decl., Ex. 8 ("Johnson Dep.") 73:14–19; Ex. 2 at 1.) Still, prior to the incidents

---

[1] The parties have consented to jurisdiction by magistrate judge pursuant to 28 U.S.C. § 631(c)(1).

OPINION AND ORDER — 2 [AHS]

giving rise to this suit, Johnson received formal discipline five times — twice for sexually charged conduct. (*Id.*) In 1998 and 2003, he received a written reprimands for making inappropriate sexual remarks to a coworker's wife at her home during business hours and for making inappropriate sexual and threatening remarks on the job, respectively. (Weingart Decl., Ex. 5 at 1; Ex. 7 at 1–2.) Johnson also gave at least one unsolicited back massage to a female supervisor, though there is no record of the supervisor reporting the massage. (Weingart Decl., Ex. 8 ("Okazaki Dep."), 12:20–13:3; Weingart Decl., Ex. 10.)

In 2013, Keyes was convicted of driving under the influence of intoxicants and sentenced to enhanced bench probation and court-ordered community service. (Gilmore Decl., Ex. 7 ("Keyes RFA") at 7–8; Weingart Decl., Ex. 16 ("Keyes Aff.") ¶ 1.) On the morning of April 4, 2014, Keyes arrived at the parking lot of the Washington County Jail, the LUT pick-up site for community-service workers. (Gilmore Decl., Ex. 6 ("Police Rep.") at 4.) Community Service Program Monitors picked up crews from those assembled in the parking lot each morning, to complete daily projects. (Weingart Decl., Ex. 1; Police Rep. at 4.) Keyes stood in line next to Ulan Moore ("Moore"), with whom Keyes had worked previously on another LUT work crew. (Weingart Decl., Ex. 14 ("Keyes Dep.") 35:16–23.)

Johnson's project on April 4 was to dispose of deer carcasses. (Johnson Dep. 29:21–24; Keyes Dep. 36:17.) Keyes and Moore were the only workers on Johnson's crew. (Keyes Dep. 36:21–23; Keyes Aff. ¶ 3.) Johnson drove Keyes and Moore to and from their work sites in a county-owned van. (Keyes Aff ¶ 4; Police Rep. at 4.) During their lunch break, Keyes showed Moore pictures on her mobile phone. (Police Rep. at 5.) Johnson asked Keyes to show him what she and Moore had been looking at on her phone. (*Id.*) Based on Johnson's statements throughout

the day, Keyes believed Johnson had the authority to arrest her or cause her to be arrested for any misconduct during her community service. (Keyes Aff. ¶ 7.) Thinking Johnson was enforcing a community service program rule, Keyes gave Johnson her phone, which depicted a photo of Keyes in a bathing suit. (Police Rep. at 5.) Johnson then asked Keyes if she had any "sexy pictures" on her phone. (*Id.*) Keyes replied that she did not and told Johnson she had a boyfriend and two children. (*Id.*) Johnson began talking about graphic and sexually explicit photos he had seen on a female coworkers's mobile phone. (*Id.*) After lunch, Johnson told Keyes she was to take "sexy pictures" of herself and bring them to community service the next day as a "homework" assignment. (*Id.*; Keyes Aff. ¶ 8.)

At the end of the workday, Johnson drove Keyes to a gas station across the street from the designated drop-off location, the Washington County Jail parking lot. (Police Rep. at 5; Keyes Aff. ¶ 9.) Keyes got out of the van, then reached back into the vehicle to retrieve her duffel bag. (Keyes Aff. ¶ 9; Police Rep. at 5.) As she did so, Johnson grabbed her buttocks and genital area. (Police Rep. at 5–6; Keyes Aff. ¶ 9.) Upon realizing Johnson was groping her, Keyes moved away from Johnson as fast as she could. (Keyes Dep. 70:18–71:2.) Johnson did not attempt to keep Keyes from leaving but told Keyes that she was "a bad girl"" and that he would "teach [her] how to get a spanking." (Keyes Aff. ¶ 10; Police Rep. at 6.) When Keyes looked back at Johnson, he made a hand gesture simulating taking photos with a camera, which Keyes understood as a reference to the "homework" Johnson had assigned earlier in the day. (Keyes Aff. ¶ 10; Keyes Dep. 71:8–21.)

*Procedural History*

Keyes filed her initial complaint in 2015. (ECF No. 1.) The County Defendants filed motions to dismiss and for judgment on the pleadings, which the court granted in part and denied

in part, and Keyes filed a First Amended Complaint in accordance with that ruling. (ECF Nos. 8, 26, 28.) In her operative complaint, Keyes alleges constitutional violations of the Fourth and Eighth Amendments under 42 U.S.C. § 1983, and common-law battery under Oregon law, against all defendants. (ECF No. 28.) Keyes also asserts a common-law negligence claim against the County Defendants. (*Id.*) The County Defendants moved for summary judgment on all claims against them. (ECF No. 34.) Johnson sought summary judgment as to only the constitutional claims against him. (ECF No. 37.)

    *I.*    *Summary Judgment Opinion and Order*

In an August 10, 2017 Opinion and Order, the court, among other conclusions, denied summary judgment as to the County Defendants' vicarious liability for Johnson's alleged battery and to Keyes's negligent hiring and training claims. (Summary Judgment Opinion at 18, 20, 21.) With respect to the battery claim, the court employed Oregon courts' *respondeat superior* analysis under *Chesterman v. Barmon*, 305 Or. 439, 442 (1988), as interpreted and refined by *Lourim v. Swensen*, 328 Or. 380, 386–87 (1999), *Fearing v. Bucher*, 328 Or. 367, 374–74 (1999), and *Barrington ex rel. Barrington v. Sandberg*, 164 Or. App. 292, 295 (1999) to arrive at the dispositive question: whether Johnson's performance of his assigned duties led to the battery, or conversely, whether the two were insufficiently connected to trigger employer liability. (*Id.* at 16–17.) However, the court ultimately declined to answer that inquiry, finding that questions of fact precluded summary judgment. (*Id.*)

As to Keyes's negligent hiring claim,[2] the court again applied Oregon law mandating that such claims require "proof that an employer hired or retained an employee with dangerous

---

[2] Keyes's negligent hiring claim is coextensive with her negligent retention claim and thus is addressed attendantly by the following analysis. *See* Summary Judgment Opinion at 18–19.

OPINION AND ORDER — 5                                                            [AHS]

propensities of which the employer knew or should have known." (*Id.* at 18 (citing *Hansen v. Cohen*, 203 Or. 157, 160–61 (1954) and *Hoke v. May Dep't Stores Co.*, 133 Or. App. 410, 416 (1995)). Defendants had urged the court that *Kelley v. Oregon Shipbuilding Corp.*, a 1948 case stemming from shipbuilding operations during the Second World War, directed that only prior attacks or threats could give rise to a negligent hiring, or in this context, retention, claim. 183 Or. 1, 7 (1948). The court found that case largely inapposite, however, instead relying primarily on *Hoke*, in which issues of fact precluded summary judgment where a security guard accused of sexually assaulting a minor had been retained after having been accused of much the same conduct previously. (Summary Judgment Opinion at 19–20 (citing *Hoke*, 133 Or. App. at 412–13.)) Guided by *Hoke*, the court concluded that factual issues surrounding the reasonableness of the County's investigation into Johnson's past conduct and its decision to hire and retain him precluded summary judgment in the instant case as well. (*Id.* at 20.) The case is now set for jury trial in April 2018. (ECF No. 55.)

*Discussion*

I.   *Reconsideration*

The County Defendants now challenge these holdings on grounds they are based on erroneous reliance and misapplication of the aforementioned case law. (Motion at 2–3.) Specifically, Defendants contend the court (1) misapplied *Lourim*, and the related *Fearing*, arguing that conduct leading to a *respondeat superior* liability-inducing intentional act be a "progressive series of actions," rather than a single incident; (2) improperly relied on *Hoke* rather than *Kelley*; and (3) erroneously concluded that "sexually vulgar statements can be a basis for determining whether

OPINION AND ORDER — 6                                                                              [AHS]

a person will commit sexual misconduct more than a decade later." (Motion at 2, 5, 8–10.)

So long as a court has jurisdiction over a case, "it possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient." *City of L.A., Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2011); *see also* FED. R. CIV. P. 54(b) ("[A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment . . . .") However, reconsideration is "an extraordinary remedy, to be used sparingly . . . ," *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000), and a motion to reconsider should not be used to implore the court to rethink matters already decided. *Century Indem. Co. v. The Marine Grp., LLC*, No. 3:08-CV-1375-AC, 2016 WL 96147, *2 (D. Or. Jan. 7, 2016) (citing *Motorola Inc. v. J.B. Rodgers Mechanical Contractors*, 215 F.R.D. 581, 582 (D. Az. 2003)). A court should reconsider its earlier decision only if it "(1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." *Sch. Dist. No. 1J v. AcandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993).

Defendants fail to show that the facts of this case support reconsideration. First, defendants can point to no "newly discovered evidence" showing that an alternative outcome is proper. In fact, Defendants proffer no additional supporting documentation at all.

Second, the court neither committed clear error in denying summary judgment on these claims, nor was that decision manifestly unjust. Rather than point to any patent mistake or omission in the court's reasoning or legal understanding, defendants attempt only to relitigate the underlying merits of the case, matters already addressed and decided. Furthermore, the denial of summary

judgment is hardly unjust: by denying ruling on these issues as a matter of law, the court did not foreclose on any of Defendants' arguments; it merely reserved them for more appropriate disposition by the jury.

Third, Defendants cite no intervening change in the controlling law since the court's August 10, 2017 decision. Rather, each of defendants' arguments derive from supposed misapplications or misconstructions of *existing* law, all of which were already litigated and addressed in the Summary Judgment Opinion.

The court concludes that no new evidence, court error or injustice, or change in the law supports reconsidering the court's August 10, 2017 Opinion and Order. It therefore declines to do so.

## II.    *Certification*

In the alternative, Defendants move to certify the following questions to the Oregon Supreme Court:

> (1) For purposes of vicarious liability, "does a 'progressive series of acts' under *Lourim v. Swenson*, 328 Or. 380 (1999) and *Fearing v. Bucher*, 328 Or. 367, 372 (1999) include sexual misconduct that occurs over a period of hours on a single shift without the knowledge of the employer?
>
> (2) Does *Kelley v. Oregon Shipbuilding Corp.*, 183 Or. 1 (1948) prohibit a claim for vicarious liability for sexually vulgar comments made to a different person more than a decade prior to a single incident of intentional criminal sexual misconduct?
>
> (3) Is it foreseeable that an employee who makes sexually inappropriate comments at work to someone other than plaintiff will engage in intentional criminal sexual misconduct more than 10 years later?"

(Motion at 11.)

The Oregon Supreme Court has established five criteria that govern when certification is

appropriate. *Western Helicopter Services, Inc. v. Rogerson Aircraft Corp.*, 311 Or. 361, 364–71 (1991). The question must, first, come from a statutorily authorized certifying court, and second, be one of law. Third, the law at issue must be Oregon law. Fourth, the question must be determinative of at least one claim in the case. And fifth, to warrant certification, controlling Oregon precedent must be lacking. *Id.* at 364–65. The first four factors should be considered objectively, and the fifth, subjectively. *Id.* at 366. Ultimately, though, the decision to certify a question of state law to the highest court of the state "rests in the sound discretion of the federal court." *Micomonaco v. State of Washington*, 45 F.3d 316, 322 (9th Cir.1995) (quoting *Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974)).

Defendants' first question fails to meet both the fourth and fifth certification criteria. As to the fourth, the question is non-dispositive for two reasons, either of which would be independently fatal to certification. First, *Lourim* and *Fearing* provided only a part of the support for the court's ultimate conclusion that a jury could find Johnson's first inappropriate remarks to Keyes were part of his assigned duties and that his motivation in making those comments was to serve Defendants in his supervisory role. Indeed, that conclusion was based foremost on the analysis prescribed by *Chesterman v. Barmon*, 305 Or. 439, 442 (1988) and refined by *Barrington ex rel. Barrington v. Sandberg*, 164 Or. App. 292, 295 (1999). *See* Summary Judgment Opinion at 16. Thus, even if the Oregon Supreme Court were to resolve the first question in Defendants' favor, thereby rendering *Lourim*'s "progressive series of acts" language inapplicable here, the facts of the case still would fall the same way within *Chesterman* and *Barrington*'s test. Second, for this very reason, the first question is non-determinative because the fact-specific jury inquiry illustrated in the court's opinion nevertheless would persist and preclude certification. *Id.* at 18; *W. Helicopter Servs., Inc.*, 311 Or.

at 364 (noting certification " is not appropriate if disputed facts make questions of law unclear"); *see e.g., Allstate Ins. Co. v. Breeden*, No. CIV. 01-1686-AS, 2008 WL 3200803, at *11 (D. Or. Aug. 6, 2008) (denying certification "because [] facts questions must be decided by the trier of fact, [thus] determination of these questions would not be determinative of the case.")

With respect to the fifth criterion, "perhaps the most important one" to the Oregon Supreme Court, certification is appropriate only after the certifying court has subjectively "satisf[ied] itself that it is not certifying questions of law already controlled by existing Oregon appellate precedent." *W. Helicopter Servs., Inc.*, 311 Or. at 366. In this case, ample Oregon appellate precedent guides the court's interpretation of *Lourim* and *Fearing*: namely, *Barrington*, again, cited for its intentional tort-specific analysis. To be sure, *Barrington* did not involve a series of acts occurring over the span of a single day, but applying such facts to the framework established by the Oregon appellate courts is well within this court's interpretive province.

Further, even if the court did desire additional cases interpreting *Lourim* and *Fearing* generally, other examples include *Schmidt v. Archdiocese of Portland in Oregon*, 218 Or. App. 661 (2008),*rev'd sub nom. on other grounds in Schmidt v. Mt. Angel Abbey*, 347 Or. 389 (2009), and *Minnis v. Oregon Mut. Ins. Co.*, 334 Or. 191 (2002). Though Defendants argue neither of those cases directly interprets *Lourim*'s "progressive series of acts" language, the Oregon Supreme Court does not require that the Oregon appellate precedent completely resolve or even directly address the question at issue. Instead, the Oregon Supreme Court has delegated this determination to the subjective discretion of the district court. With that guidance in mind, this district court is satisfied in the sufficiency of the body of Oregon appellate law informing its understanding and treatment of the legal issues presenting here. Therefore, certification of Defendants' first proposed question

would be inappropriate.

Defendant's second question is similarly unsuitable for certification, due both to outstanding factual disputes and the fact-specific nature of the inquiry. The latter part of this question, as phrased by Defendants, assumes that Johnson's prior misconduct came only in the form of "sexually vulgar comments made to a different person more than a decade prior." This assumption mischaracterizes the conduct of which Johnson has been accused. At least one of the incidents reported against Johnson included verbally "threatened violent action," to which he later admitted. (Keyes's Memorandum in Opposition to Reconsideration and Certification (ECF No. 58), Ex. 1 at 1, 4.) Further, as the Summary Judgment Opinion makes clear, it remains disputed whether Defendants knew of an additional incident of workplace misconduct: the alleged unsolicited massages. Summary Judgment Opinion at 20. If proven, this allegation would constitute not only repeated prior verbal misconduct, but prior physical misconduct, thereby rendering Defendants' question moot.

In their reply, Defendants agree to "accept [Keyes]'s interpretation of the facts as an explanation of the prior conduct in order to present this question of law" and revise their second question accordingly to

> Does *Kelley*[] prohibit a claim for vicarious liability where the prior conduct is limited only to inappropriate sexually offensive statements and threats of violence towards someone other than the Plaintiff more than a decade prior to a single incident of intentional criminal sexual misconduct?

(Defendants' Reply to Opposition to Motion to Certify (ECF No. 59) at 5.) But this entire endeavor only exemplifies the fact-specific nature of the question posed. *See Allstate Ins. Co. v. Breeden*, No. CIV. 01-1686-AS, 2008 WL 3200803,*11 (D. Or. Aug. 6, 2008) (denying certification "[b]ecause factual issues still exist[ed], [thus, the] questions [we]re not questions of law").

The very same factual disputes underlie Defendants' third proposed question for certification. And again, Defendants accede to reframe the question to account for facts favorable to Keyes that were previously ignored. But this question — at bottom, one of foreseeability — even more so presents a question not of law for the court but of fact for the jury. *See e.g., Piazza v. Kellim*, 360 Or. 58, 69–70 (2016) (en banc) ("The concept of foreseeability embodies a prospective judgment about a course of events; it therefore ordinarily depends on the facts of a concrete situation and, if disputed, is a jury question."). Certification as to Defendants' third proposed question would therefore likewise be inappropriate.

In sum, not one of Defendants' three questions meets the criteria set forth by the Oregon Supreme Court. Therefore, the court declines to exercise its discretion to certify.

*Conclusion*

For the aforementioned reasons, the court DECLINES to reconsider its August 10, 2017 Opinion and Order (ECF No. 49) and DECLINES to certify the above questions to the Oregon Supreme Court. Accordingly, Defendants' Motion to Reconsider Rule on Defendants' Motion for Summary Judgment or, in the Alternative, to Certify the Question to the Oregon Supreme Court (ECF No. 51) is DENIED.

IT IS SO ORDERED.

Dated this 11th day of December, 2017.

JOHN V. ACOSTA
United States Magistrate Judge